# Exhibit A

## IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY, PENNSYLVANIA

| | |
|---|---|
| **STANLEY WALESKI**, on his own behalf and on behalf of all others similarly situated, | No. ___201804431___ |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND FOR BREACH OF CONTRACT** |
| v. | Filed on behalf of Plaintiffs |
| **MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP, NATALIE D. RAMSEY** and **LEONARD A. BUSBY,** | Counsel of Record for this Party: |
| Defendants. | Scott M. Hare, Esquire Pa. I.D. No. 63818 |
| | 1806 Frick Building 437 Grant Street Pittsburgh, PA 15219 |
| | Tel:    412-338-8632 |

## IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY, PENNSYLVANIA

**STANLEY WALESKI**, on his own behalf
and on behalf of all others similarly situated,

      Plaintiffs,

      v.

**MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP,
NATALIE D. RAMSEY** and
**LEONARD A. BUSBY,**

      Defendants.

No. _201804431_____

### NOTICE TO DEFEND

    You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by an attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

    **YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

    **IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Lawyer Referral Service
Luzerne County Bar Association
200 N. River Street
Wilkes-Barre, PA 18711

Telephone:   570-822-6029

# IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY, PENNSYLVANIA

**STANLEY WALESKI**, on his own behalf
and on behalf of all others similarly situated,

    Plaintiffs,

      v.

**MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP,
NATALIE D. RAMSEY** and
**LEONARD A. BUSBY,**

    Defendants.

No. _____

## CLASS ACTION COMPLAINT AND JURY DEMAND

    Plaintiff Stanley Waleski, by his undersigned counsel, acting on his own behalf and on behalf of all those who are similarly situated, files this Class Action Complaint and Jury Demand for Breach of Contract against Defendants Montgomery, McCracken, Walker and Rhoads LLP, Natalie D. Ramsey and Leonard A. Busby, and states the following good cause in support:

### _Introduction and Summary of this Lawsuit_

    1.    This is a class action lawsuit to recover damages for breach of contract arising from the Defendants' actions and inactions committed while representing the interests of the members of the Plaintiff Class in connection with bankruptcy proceedings filed by the Kerr-McGee Corporation and its affiliates (collectively herein "Kerr-McGee").

    2.    The Plaintiff Class consists of the 4300-plus injured victims of Kerr-McGee Chemical and Kerr-McGee Corporation, whose Wood Treatment Plant in Avoca, Pennsylvania poisoned Avoca residents with toxic and carcinogenic creosote and its constituents for many decades. As the Avoca Plaintiffs' devastating physical injuries and illnesses began to manifest (including skin, lung, kidney, colon, pancreatic and breast cancers, cardiovascular disease, pre-

cancerous skin lesions, and asthma), Plaintiffs commenced filing lawsuits in January 2005 to recover damages from Kerr-McGee. In 2007 this Court placed the cases on the "Inactive Docket" to allow the cases to proceed to binding arbitration before former Pennsylvania Supreme Court Justice Russell M. Nigro.

3.      The Avoca Plaintiffs prevailed on all issues in each of the first two arbitration cases before Justice Nigro, who found that Kerr-McGee was liable for the claims being made and awarded damages to each of the arbitration claimants.

4.      In the meantime, unknown to the Avoca Plaintiffs, the Kerr-McGee defendants and their affiliates schemed to deprive the Plaintiffs of any source of recovery for their devastating injuries by fraudulently transferring billions of dollars' worth of assets of the Kerr-McGee entities, for little or no consideration, to a newly-formed entity known as "New Kerr-McGee," ostensibly leaving the "Old Kerr-McGee" entities with no assets with which to satisfy Plaintiffs' claims.

5.      As the Avoca Plaintiffs readied to present their next batch of arbitration claims, the "Old Kerr-McGee" defendants (by then renamed Tronox, Inc.) filed consolidated chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Southern District of New York on January 12, 2009. As a result, any further arbitration proceedings were halted by the bankruptcy automatic stay.

6.      Given the complex legal issues arising from the bankruptcy filing, and the likely impact of the bankruptcy on the administration and collection of the Avoca Plaintiffs' claims, Plaintiffs' state-court attorneys contracted with Defendants Montgomery, McCracken, Walker and Rhoads LLP, Natalie D. Ramsey and Leonard A. Busby, who professed expertise in complex bankruptcy litigation and related matters, to protect the Avoca Plaintiffs' interests and maximize their recovery in the bankruptcy case.

7.     Unfortunately, as elaborated below at greater length, the Defendants failed to fulfill their contractual obligation to protect the Avoca Plaintiffs' interests and failed to take necessary steps to maximize their recovery in the bankruptcy case, as they agreed to do, resulting in damages to the Plaintiff Class of $619,306,880.

8.     Plaintiff therefore brings this lawsuit to make the Plaintiff Class whole by recovering the additional payments to which the class members were entitled in the bankruptcy case, but which were lost to them as a result of the Defendants' contractual breaches described below.

### *Parties*

9.     Plaintiff Stanley Waleski is an adult citizen of the Commonwealth of Pennsylvania and resides in Luzerne County. Waleski was one of the Avoca Plaintiffs in the underlying litigation and bankruptcy proceedings.

10.     Defendant Montgomery, McCracken, Walker and Rhoads LLP ("Montgomery") is a Pennsylvania limited liability partnership formed under the laws of the Commonwealth of Pennsylvania. Montgomery describes itself as a full-service law firm representing leading businesses, multinational corporations, nonprofit organizations and individuals across a wide range of industries in complex litigation matters and challenging disputes.

11.     Defendant Natalie D. Ramsey is an adult citizen of the Commonwealth of Pennsylvania, is a licensed Pennsylvania attorney and is a Partner in the Montgomery firm. Ramsey is the Chair of the firm's Creditors' Rights and Bankruptcy practice group with a practice focusing on corporate reorganization and bankruptcy, including asset recovery litigation.

12.     Ramsey expressly or impliedly agreed to represent the interests of Waleski and the other members of the Plaintiff Class as set forth herein.

13.    Defendant Leonard A. Busby is an adult citizen of the Commonwealth of Pennsylvania, is a licensed Pennsylvania attorney and is a former Partner (now Senior Counsel) in the Montgomery firm. Busby is a member of the firm's Complex Litigation group with a litigation practice emphasizing complex litigation, injunctions and appeals.

14.    Busby expressly or impliedly agreed to represent the interests of Waleski and the other members of the Plaintiff Class as set forth herein.

### *Class Allegations*

15.    Plaintiff Stanley Waleski files this lawsuit as a class action pursuant to Pa. R. Civ. P. 1701 *et seq.*, on his own behalf and on behalf of all injured claimants, known as the "Avoca Plaintiffs," whose interests Defendants represented as creditors in bankruptcy proceedings involving Tronox/Kerr-McGee and its affiliates, all as described at greater length herein.

16.    Defendants agreed to represent the interests of all of the Avoca Plaintiffs collectively. As such, the material facts relevant to this action are identical for all members of the Plaintiff Class.

17.    The Plaintiff Class includes approximately 4362 members and is, therefore, so numerous that joinder of all members would be impracticable and would create a substantial administrative burden for the Court and the parties. The identity of each member has already been determined in prior legal proceedings, including the bankruptcy proceedings discussed herein.

18.    There are questions of law and fact common to all members of the Plaintiff Class, and such common questions will predominate in the disposition of this action. Among the common questions of law and/or fact are whether Defendants breached their contractual obligations, whether Defendants failed to advocate, protect and advance the interests of the Plaintiff Class members, as they agreed to do, and whether Plaintiffs are entitled to recover damages.

19.    The claims of the Plaintiff Class representative, Stanley Waleski, are identical to or at least typical of the claims of the remaining class members.

20.    The Plaintiff Class representative will fairly and adequately assert and protect the interests of the class as required by Pa. R. Civ. P. 1709. In particular: (1) the undersigned counsel will vigorously and adequately represent the interests of the class; (2) the class representative has no conflict of interest in maintaining a class action; and (3) class counsel has adequate financial resources to assure that the interests of the class will not be harmed.

21.    A class action will provide a fair and efficient method for adjudication of the controversy set forth herein. In particular, with respect to Plaintiffs' claims for monetary recovery: (1) common questions of law and fact will predominate over particular questions affecting only individual members; (2) management of the action as a class action will not create any special difficulties, whereas the filing of 4300-plus individual claims would dramatically and needlessly overburden the court system; (3) the prosecution of separate actions by individual class members would create a risk of either inconsistent adjudications or the disposition or impairment of the interests of others similarly situated; (4) the representative Plaintiff is unaware of any similar pending class action litigation against these Defendants raising the claims to be adjudicated in this action; (5) this forum is appropriate and well-equipped to handle the claims of the entire class; and (6) the amounts likely to be recovered by individual class members are adequate to justify the expense and effort of administering the claims as a class action. Further, some members of the Plaintiff Class may be unaware that they have claims as articulated herein. Finally, to the extent this Court determines that equitable relief is warranted, Defendants have acted on grounds applicable generally to the class as a whole, thereby making final equitable relief appropriate with respect to the class as a whole.

### *CAFA Is Not Applicable*

22.     Waleski asserts solely Pennsylvania state-law claims and causes of action against Pennsylvania Defendants.

23.     This lawsuit solely concerns contractual services provided by Defendants on behalf of Pennsylvania residents and/or one-time residents. The overwhelming majority of the members of the Plaintiff Class are domiciliaries and residents of Pennsylvania.

24.     Defendants are all domiciliaries and residents of Pennsylvania.

25.     For these reasons, the Federal Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453 and 1711–15, does not apply to this lawsuit.

26.     Additionally, even if CAFA were otherwise applicable, far more than two-thirds of the members of the proposed Plaintiff Class, and all Defendants, are citizens of Pennsylvania, and therefore this lawsuit is subject to mandatory abstention under the local controversy exception. See 28 U.S.C. § 1332(d)(4)(the federal court "shall decline" to exercise removal jurisdiction over any class action in which "two-thirds or more of the members of all proposed Plaintiff Classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.").

27.     Defendants are well aware of the domicile and citizenship of the members of the Plaintiff class as a result of their work representing the interests of the Plaintiffs. For these reasons, any attempted removal of this action under CAFA would lack factual or legal basis and would violate Fed. R. Civ. P. 11.

## *Background Facts*

**A.    The Avoca Litigation – Plaintiffs' Injury Claims are Proven**

28.    During the forty-year period from 1956 to 1996, the company then known as Kerr-McGee Chemical poisoned its neighbors and their community by recklessly operating a creosote factory in Avoca, Pennsylvania.

29.    Beginning in January 2005, Plaintiffs' original attorneys began filing lawsuits on their behalf in this Court, seeking damages from Kerr-McGee for the injuries caused to the Avoca Plaintiffs.

30.    In or about May 2007 this Court placed the cases on an administrative "Inactive Docket" to allow the claims to be adjudicated through binding arbitration conducted by former Pennsylvania Supreme Court Justice Russell M. Nigro.

31.    Justice Nigro and the parties thereafter agreed on procedures to adjudicate the Plaintiffs' claims in batches, each consisting of a manageable number of individual plaintiffs with similar medical conditions.

32.    By the end of 2008, Justice Nigro had conducted arbitration trials and issued decisions in the first two sets of arbitration cases, finding in Plaintiffs' favor on all liability issues and awarding damages to each of the individual plaintiffs consistent with their individual claims.

33.    With Plaintiffs' liability theories thereby vindicated and established for all subsequent claims by collateral estoppel, Plaintiffs' state-court attorneys prepared to present the next batch of claims to Justice Nigro for determination and liquidation of damages.

34.    Further adjudication of the arbitration cases was stayed, however, on January 12, 2009, because Tronox/Kerr-McGee and its affiliated companies filed Chapter 11 bankruptcy Petitions, giving immediate rise to the automatic stay in bankruptcy pursuant to 11 U.S.C. § 362.

**B.**     <u>**Bankruptcy Proceedings – Montgomery Impairs Plaintiffs' Claims**</u>

35.     Even before the January 12, 2009 bankruptcy filings, Plaintiffs' state-court attorneys had begun developing concerns that Kerr-McGee might seek to sidestep its obligations to the Avoca Plaintiffs by filing a bankruptcy or otherwise attempting to frustrate collection of anticipated recoveries in the arbitration proceedings. Recognizing that bankruptcy proceedings would require specialized expertise in bankruptcy law to protect Plaintiffs' interests, Plaintiffs' state-court attorneys contracted with Montgomery to obtain its assistance.

36.     By Contingent Fee Agreement dated January 27, 2009, Montgomery contractually agreed to render assistance to Plaintiffs' state-court attorneys in representing the interests of the Avoca Plaintiffs in the Tronox Bankruptcy case. A true copy of the Contingent Fee Agreement is attached as Exhibit A.

37.     Montgomery prepared the Contingent Fee Agreement and placed it on Montgomery firm letterhead. The Contingent Fee Agreement provides, in relevant part, as follows:

<u>**Contingent Fee Agreement**</u>

The Powell Law Group, P.C. ("PLG") hereby retains Montgomery, McCracken, Walker & Rhoads, LLP ("MMW&R") on a contingent fee basis in connection with the PLG's current representation of approximately 4,362 plaintiffs in the case captioned as In Re: Avoca Litigation now pending in the Court of Common Pleas of Luzerne County, Pennsylvania, Civil Action No. 7-2005 (the "Avoca Litigation"). *__MMWR will, in a manner to be mutually agreed with PLG, represent the interests of these same plaintiffs in the bankruptcy proceedings of Tronox, Incorporated, and all related entities, now pending in the United States Bankruptcy Court for the Southern District of New York,__* Case No. 09-10156-ALG ("Tronox Bankruptcy"). *__MMWR shall proceed in the Tronox Bankruptcy in such manner as PLG and MMWR shall both agree. MMWR shall also assist PLG in the Avoca Litigation in such manner as PLG and MMWR shall both agree.__*

\* \* \*

*__MMWR shall have no obligation to represent PLG's said clients in any appeal.__*

Exhibit A (emphasis added).

38.    By its express terms, the Contingent Fee Agreement obligates Montgomery, *inter alia*, to perform tasks as allocated by PLG and agreed by the two law firms.

39.    By its express terms, the sole limitation on the scope of work to be performed by Montgomery pursuant to the Contingent Fee Agreement is a disclaimer of any obligation to represent the clients in any appeal. But for this single express limitation, the scope of Montgomery's contractual obligation was plenary and encompassed all work needed to represent the interests of the Plaintiffs in the Tronox Bankruptcy.

40.    Montgomery has repeatedly admitted that the purpose and effect of the Contingent Fee Agreement was to retain the firm to assist in representing the interests of the Plaintiffs.

41.    Among other specific tasks assigned to Montgomery early in the bankruptcy case, Plaintiffs' state-court attorneys repeatedly warned that other purported claimants asserting unrelated claims against Kerr-McGee might seek to intrude upon Plaintiffs' rightful recovery. In particular, Plaintiffs' state-court attorneys repeatedly warned of potential claims from property owners in Mississippi who were represented by an aggressive lawyer from that state, and repeatedly instructed Montgomery to take steps to protect against any intrusion from such claims. (As elaborated below, these concerns were well-founded and prophetic, as the Mississippi claimants eventually succeeded in taking at least $140,000,000 of recoveries that otherwise would have been paid to the Plaintiff Class, which loss resulted directly from Montgomery's failure to protect Plaintiffs as agreed.)

42.    On February 5, 2009, Ramsey filed a Motion for Admission *Pro Hac Vice* with the bankruptcy court in order to represent Michael E. Carroll in his capacity as a member of the Creditors' Committee, to which he was appointed at Montgomery's suggestion and recommendation.

43.    Defendants' decision to represent Mr. Carroll individually in his capacity as a member of the Creditors' Committee, while already contractually obligated to represent the interests of the Avoca Plaintiffs collectively as uniquely-situated unsecured creditors, placed them in an irreconcilable and undisclosed conflict of interest. In particular, the Unsecured Creditors' Committee is a fiduciary of the class of unsecured creditors as a whole. *In re* Adelphia Comm. Corp., 544 F.3d 420, 424 n.1 (2d Cir. 2008). As such, members of the Unsecured Creditors' Committee "have obligations of fidelity, undivided loyalty, and impartial service in the interest of the creditors they represent." *In re* Mesta Mach. Co., 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Individual creditors on the committee must "act with undivided loyalty for the benefit of all of the unsecured creditors." *In re* ABC Auto. Prods. Corp., 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997)(denying application of law firm to be appointed as counsel to the Unsecured Creditors' Committee where it simultaneously represented individual creditors). Accordingly, by undertaking to represent a member of the committee in that fiduciary capacity, Defendants created an improper conflict of interest which impaired their existing obligations to represent the unique interests of the Avoca Plaintiffs. Defendants failed to disclose this conflict of interest (which was unknown to the Avoca Plaintiffs or their state-court attorneys) and failed to obtain a knowing waiver thereof.

44.    By Order dated May 28, 2009 (the "Bar Date Order"), the bankruptcy court established August 12, 2009 as the bar date for filing creditor claims in the bankruptcy case. The Bar Date Order was served directly upon all creditors and other parties-in-interest in the case, and in particular was served directly upon Montgomery, Natalie Ramsey and Leonard Busby. Proof of Service of the Bar Date Order was recorded on the bankruptcy docket by Affidavit dated and filed June 10, 2009. A true copy of the Bar Date Order dated May 28, 2009 is attached as Exhibit B.

45.    The Bar Date Order mandated, *inter alia*, that all alleged creditor claims be filed on or before August 12, 2009 and that each purported creditor file a separate, individual proof of

-10-

claim meeting certain designated substantive requirements. Pursuant to the Bar Date Order, any claims that were not timely and properly filed would be disallowed and therefore entitled to no payment.

46.    Montgomery directed the Avoca Plaintiffs' state-court attorneys to prepare individual proofs of claim for each individual Plaintiff, instructing the state-court attorneys to document and substantiate each individual claim as required by the Bar Date Order. The Avoca Plaintiffs' state-court attorneys promptly completed the task, and on June 2, 2009, well before the Bar Date deadline, Montgomery filed more than 4300 individual proofs of claim, all of which were prepared for the Avoca Plaintiffs by their state-court attorneys.

47.    Contrary to the mandates of the Bar Date Order (and unlike Plaintiffs' own proofs of claim, which were properly detailed and filed on an individual basis), on or about August 3, 2009, a so-called "Mississippi *Ad Hoc* Committee," which was allegedly "formed" just days earlier on July 12, 2009, filed a purported "omnibus claim" in the amount of $12.5 million on behalf of the *Ad Hoc* Committee as an ostensible surrogate for alleged (though entirely unidentified) Mississippi-based creditors. In reality, the "*Ad Hoc* Committee" was an imaginary creation with no legal existence or identity.

48.    Prompted by the early warnings of Plaintiffs' state-court attorneys regarding the anticipated — and eventual — Mississippi competing claims, Defendants purportedly spent substantial legal time researching issues surrounding the Mississippi claims and the objectionable "omnibus claim" filed by the *Ad Hoc* Committee.

49.    Unfortunately for the Plaintiff Class — whose interests Montgomery was required to protect - despite the early and repeated warnings and instructions of Plaintiffs' state-court attorneys, despite the clear mandate of the Bar Date Order, and despite the research and investigation purportedly conducted by Montgomery, Defendants failed to object at any time to

the "omnibus claim" filed by the *Ad Hoc* Committee. (As elaborated below, this failure directly resulted in the allowance and payment of alleged claims to the Mississippi claimants, not in the original stated amount of $12.5 million, but in the amount of at least $140,000,000, all of which was diverted on a dollar-for-dollar basis from the recovery that was otherwise eventually paid to the Plaintiff Class.)

### C.    Creation and Funding of Creditors Trust

50.    As prefaced above, prior to filing their bankruptcy petitions, Kerr-McGee and its affiliates secretly and fraudulently transferred billions in assets of the Kerr-McGee entities, for little or no consideration, to a newly-formed entity, "New Kerr-McGee."

51.    The fraudulent transfer was soon detected in the bankruptcy proceedings, resulting in the filing of litigation to recover the value of the fraudulent transfer for the benefit of the bankruptcy estate and its creditors.

52.    Because the Tronox/Kerr-McGee debtors transferred the bulk of the companies' assets, leaving only an insolvent shell to satisfy the extensive creditor claims, including the claims of the Avoca Plaintiffs, it was apparent that the fraudulent transfer litigation would be the primary source of funds to pay creditor claims such as those filed on behalf of the Plaintiffs herein.

53.    Acting in its official capacity as bankruptcy court-approved counsel for Plaintiff Class member Michael E. Carroll, a member of the Creditors' Committee, Montgomery took responsibility for drafting trust documents (which Montgomery described, boastfully, as "state-of-the-art") to establish and govern the administration of a personal injury creditors' trust, which would be responsible for receiving funds recovered in the fraudulent transfer litigation and administering and paying allowed personal injury creditor claims.

54.     Montgomery eventually billed the bankruptcy estate $250,000 for its time spent representing Mr. Carroll on the Creditors' Committee, including time spent drafting the so-called state-of-the-art trust documents. This substantial payment was, of course, in addition to the contingent fees (to be taken from Plaintiffs' eventual recovery) that it negotiated for itself.

55.     Defendants' decision to draft the trust documents (and to be paid handsomely to do so), while already contractually obligated to represent the unique interests of the Avoca Plaintiffs as unsecured creditors, exacerbated their conflict of interest described above.

56.     By order dated November 30, 2010, the bankruptcy court confirmed the debtors' Chapter 11 plan and the so-called state-of-the-art trust documents. The Chapter 11 plan became effective as of February 14, 2011. The confirmed plan provided in relevant part that all tort claims would be administered (as to allowance and disallowance, and as to amount) in accordance with the terms of the trust documents.

57.     The following day, February 15, 2011 — long before the Avoca Plaintiffs' claims were fully adjudicated, much less paid through the bankruptcy proceedings or the personal injury trust — Montgomery purported to terminate its representation of the Avoca Plaintiffs' interests, without the consent or agreement of the Avoca Plaintiffs or their state-court attorneys.

58.     Unfortunately for the Plaintiff Class — whose interests Montgomery was required to protect - despite the early and repeated warnings and instructions of Plaintiffs' state-court attorneys, despite the fact that Montgomery agreed to represent the interests of the Avoca Plaintiffs in the bankruptcy case, despite the fact that the fraudulent transfer litigation was known to be the primary source of funds to pay creditor claims such as those filed on behalf of the Plaintiffs, despite the so-called "state-of-the-art" polish of the trust documents, and despite the receipt of a further $250,000 fee, Montgomery failed to draft the trust documents in a fashion to protect the Avoca Plaintiffs' claims or to exclude improper competing claims, such as those of the purported

Mississippi claimants. (As elaborated below, this failure likewise directly resulted in the allowance and payment of alleged claims to the Mississippi claimants in the amount of at least $140,000,000, all of which was diverted on a dollar-for-dollar basis from the recovery that was otherwise paid to the Plaintiff Class.)

59.    Although the personal injury trust was created in the course of the Chapter 11 plan confirmation, the trust had little funding, and therefore little ability to pay creditor claims, while the fraudulent transfer litigation remained pending.

60.    The trial of the fraudulent transfer lawsuit commenced in the bankruptcy court on May 15, 2012.

61.    After four months of lengthy trial proceedings, the bankruptcy court issued its initial decision as to liability in the fraudulent transfer litigation on December 12, 2013, finding that the debtor entities had committed a fraudulent transfer of their assets to the newly-formed entity, and that the bankruptcy estate was entitled to payment of damages in the range of $5.15 billion to $14.16 billion, with the final amount to be determined after further proceedings.

62.    On January 15, 2014, the trustee of the personal injury trust (formed pursuant to the so-called state-of-the-art trust documents crafted by Montgomery) issued a final report of the claims to be paid by the trust. Among other claims to be paid were the "Category D" claims, which included the claims of the Avoca Plaintiffs in the allowed amount of approximately $949 million. Unfortunately for the Avoca Plaintiffs, however, as a result of Montgomery's failure to take any steps to object to the "omnibus claim" filed by the *Ad Hoc* Committee and its failure to draft trust documents in a fashion to protect the Avoca Plaintiffs (whose interests it agreed to protect), the "Category D" claims also included the Mississippi claims, which were recognized in the amount of approximately $343 million (*more than 27 times* the amount stated in the defective "omnibus claim"), together with other miscellaneous claims in the amount of approximately $39 million.

-14-

63.    Despite Montgomery's failure to object to the "omnibus claim" filed by the *Ad Hoc* Committee and its failure to draft competent trust documents to protect the Avoca Plaintiffs (whose interests it agreed to protect), the damages to be recovered in the fraudulent transfer litigation would nonetheless potentially pay the Plaintiff Class in full for its $949 million allowed claim, if ultimately recovered within the mid-range of damages already recognized by the bankruptcy court.

64.    In light of the data reported in the January 15, 2014 trustee's final report, and the concern over potential eventual harm to the Avoca Plaintiffs (whose interests it agreed to protect), Plaintiffs' state-court attorneys attempted to contact Montgomery throughout February 2014 to instruct the firm to object to the allowance of the Mississippi claims under Category D and rebut those claims. Unfortunately for the Plaintiff Class, Montgomery took no further steps to protect the interests of the Avoca Plaintiffs, which interests the firm itself had put at potential risk.

65.    In the meantime, the parties in the fraudulent transfer litigation and the United States government (representing the interests of federal and state government agencies) negotiated a proposed settlement of the lawsuit for $5.15 billion (the absolute bottom end of the range found by the bankruptcy court), resulting in a written settlement agreement signed on April 2, 2014. Because the settlement constituted a compromise of claims in the bankruptcy case, it was subject to objection by creditors and approval by the bankruptcy court, and therefore remained only tentative pending final court approval.

66.    On May 30, 2014 the bankruptcy court issued a report and recommendation tentatively approving the proposed settlement, subject to any objections to the settlement filed by creditors on or before July 7, 2014.

67.    Although the proposed $5.15 billion settlement was considerable (though it represented the "bare minimum" figure already reached by the court), it failed to recover sufficient funds to pay the Category D claims fully in the amount of approximately $1.33 billion, and would

therefore result in an underpayment to the Avoca Plaintiffs on account of their claims in the allowed amount of approximately $949 million. Despite this significant potential underpayment, and despite renewed outreach and instructions by Plaintiffs' state-court attorneys throughout February 2014, Montgomery failed to file any objection on behalf of the Avoca Plaintiffs on or before July 7, 2014.

68.    By order dated November 10, 2014, the United States District Court adopted the bankruptcy court report and recommendation and approved the proposed settlement.

69.    On November 19, 2014, the district court clerk entered a "Corrected Judgment" approving the settlement agreement, with an effective date of January 21, 2015.

70.    Having thus suffered actual damages (and the fact of damages) as of January 21, 2015, and having been abandoned by Montgomery, the Avoca Plaintiffs, through their state-court attorneys, continued their effort to object to the Mississippi competing claims by appealing directly to the trustee. As a result, on April 24, 2015 the trustee filed a motion with the bankruptcy court seeking instructions regarding the objection to the Mississippi claims.

71.    By order dated June 17, 2015 the bankruptcy court found that the Avoca Plaintiffs had no standing to object to the claims administration process because they (to-wit, Montgomery, which was contractually bound to protect their interests) failed to file an objection to the Mississippi "omnibus" proof of claim prior to plan confirmation. The bankruptcy court also noted that the trust documents could have been drafted differently (to-wit, by Montgomery) to give the Avoca Plaintiffs greater rights to challenge the Mississippi claims.

**D.**    **Payment of Avoca Plaintiff's Claims in a Diminished Amount**

72.    Pursuant to the final, non-appealable settlement agreement, to which Montgomery failed to object, a total of $618 million was paid into the trust for satisfaction of Category D claims on a diminished, *pro rata* basis.

73.    Had Montgomery properly and timely objected to the Mississippi "omnibus" proof of claim, as it was requested, instructed and contractually required to do, and/or had it properly drafted the trust documents to protect the interests of the Avoca Plaintiffs, the entire $618 million paid into the trust for satisfaction of Category D claims would have been remitted to the Avoca Plaintiffs.

74.    Further, had Montgomery properly and timely objected to the proposed settlement agreement, which underfunded payment of Category D claims, as it was requested, instructed and contractually required to do, the entire balance of the Avoca Plaintiffs' allowed claims of approximately $949 million would have been remitted to the Plaintiffs.

75.    Instead, because of these contractual failures by Montgomery, the Avoca Plaintiffs received a diminished total of $329,693,120, resulting in damages to the Avoca Plaintiffs of $619,306,880.

## COUNT I – BREACH OF CONTRACT
### *Plaintiffs v. All Defendants*

76.    Plaintiff incorporates the foregoing paragraphs as if fully repeated herein.

77.    Defendants agreed to protect and advance the interests of the Plaintiff Class. In particular, and without limitation, Defendants agreed to represent the interests of the Plaintiffs in the bankruptcy proceedings, agreed to maximize the recovery obtained by Plaintiffs in the

bankruptcy proceedings, and agreed to protect the claims of the Plaintiffs as against other purported creditors of the bankruptcy estate.

78.    In addition to the firm itself, Ramsey and Busby expressly or impliedly agreed to represent the interests of the Plaintiff Class as set forth herein.

79.    The parties' agreement included the implied promise and legal mandate that Defendants would zealously, competently and diligently represent the interests of the Plaintiffs. See Pa. R. Prof. Conduct 1.1, 1.3, *passim*.

80.    The parties' agreement included the implied promise and legal mandate that Defendants would avoid any conflicts of interest in the representation. See Pa. R. Prof. Conduct 1.7, 1.8, 1.8(f), 1.10, *passim*.

81.    Among other contractual obligations arising under the Contingent Fee Agreement, Defendants were required (i) to beware of, and guard against, the intrusion of competing claims, including specifically the Mississippi claims, (ii) to object to the Mississippi claims, (iii) to protect, advance and maximize Plaintiffs' claims and recovery, and (iv) to object to the inadequate proposed settlement agreement. Defendants materially breached the agreement by failing to discharge these obligations.

82.    Defendants materially breached the parties' agreement by failing to represent the interests of the Plaintiffs zealously, competently and diligently in the bankruptcy proceedings, failing to maximize the recovery obtained by Plaintiffs in the bankruptcy proceedings, failing to protect the claims of the Plaintiffs as against other purported creditors of the bankruptcy estate, failing to object to competing claims and claimants whose effect was to diminish the recovery to Plaintiffs, failing to advise regarding procedural options (including a possible return to state court), and failing to avoid conflicts of interest.

83.    In breach of their contractual obligations, Defendants failed to conduct sufficient due diligence with respect to the alleged Mississippi claims.

84.    In breach of their contractual obligations, Defendants failed to protect the interests of the Avoca Plaintiffs, and failed to maximize their recovery, by failing to object to the "omnibus" proof of claim ostensibly filed on behalf of the Mississippi claimants on multiple grounds, including, *inter alia*, (i) that it failed to conform to the claim requirements; (ii) that it purported to assert multiple claims on behalf of multiple claimants in a single proof of claim; (iii) that it purported to assert a claim on behalf of an "ad hoc" entity that did not exist and/or, in any event, was not a creditor of the debtor; (iv) that it failed to document and substantiate the alleged claims; and (v) that it asserted purported claims that were inappropriate subject matter for the Category D fund.

85.    In breach of their contractual obligations, Defendants failed to exercise available procedural options to adjudicate and maximize the Avoca Plaintiffs' claims (including a possible return to state court) and instead, artificially and without reason, assigned inadequate values to the disease categories comprising the Avoca Plaintiffs' claims, resulting in diminished claims that failed to compensate the Plaintiffs fully.

86.    In breach of their contractual obligations, Defendants failed to avoid conflicts of interest, and instead created such conflicts by representing Mr. Carroll as a member of the Creditors' Committee, and in that capacity undertaking to draft the trust documents, while already contractually obligated to protect the unique interests of the Avoca Plaintiffs.

87.    In breach of their contractual obligations, Defendants failed to draft the trust documents in a manner to protect Plaintiffs' unique and superior interests in the Category D fund, and specifically failed to draft those documents to protect Plaintiffs' interests from dilution resulting from the inclusion and eventual allowance of the Mississippi claims.

88.    In breach of their contractual obligations, Defendants improperly, prematurely, without cause and without client consent abandoned the interests of the Avoca Plaintiffs in the bankruptcy proceedings while their claims remain unresolved.

89.    In breach of their contractual obligations, Defendants failed to object to the proposed settlement agreement, which underfunded payment of Category D claims.

90.    In breach of their contractual obligations, Defendants failed to provide the Avoca Plaintiffs with critical information necessary for the continued prosecution of their claims in the bankruptcy proceedings.

91.    As a result of Defendants' material breaches of contract, Plaintiffs sustained damages, including but not limited to the loss of more than $140 million in recoveries allocated to Category D claimants, and the loss of further sums that would have been allocated to Plaintiffs' claims had Montgomery valued them properly and/or had Defendants objected to the proposed settlement agreement.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff class and against Defendants, jointly and severally, and to award damages in the amount of $619,306,880, plus statutory interest and costs.

## COUNT II – BREACH OF CONTRACT (INTENDED BENEFICIARY)
### *Plaintiffs v. Montgomery, McCracken, Walker and Rhoads LLP*

92.    Plaintiff incorporates the foregoing paragraphs as if fully repeated herein.

93.    Montgomery entered a written contract with Powell Law Group (the Contingent Fee Agreement attached as Exhibit A) to represent the interest of Plaintiffs, in exchange for which Montgomery would receive legal fees. In particular, and without limitation, Montgomery agreed to represent the interests of the Plaintiffs in the bankruptcy proceedings, agreed to protect Plaintiffs'

interests (and thereby maximize their recovery) in the bankruptcy proceedings, and agreed to protect the claims of the Plaintiffs as against other purported creditors of the bankruptcy estate.

94.    Plaintiffs were express intended beneficiaries of the Contingent Fee Agreement, and Defendants have acknowledged as much.

95.    In the alternative, Plaintiffs were implied intended beneficiaries of the Contingent Fee Agreement, and Defendants have acknowledged as much.

96.    By entering the Contingent Fee Agreement, Montgomery agreed to and did undertake obligations directly to Plaintiffs, notwithstanding the financial arrangements of the representation. See Pa. R. Prof. Conduct 1.7, 1.8, *passim.*

97.    The Contingent Fee Agreement included the implied promise and legal mandate that Montgomery would zealously, competently and diligently represent the interests of the Plaintiffs. See Pa. R. Prof. Conduct 1.1, 1.3, *passim.*

98.    The Contingent Fee Agreement included the implied promise and legal mandate that Montgomery would avoid any conflicts of interest in the representation. See Pa. R. Prof. Conduct 1.7, 1.8, 1.8(f), 1.10, *passim.*

99.    Among other contractual obligations arising under the Contingent Fee Agreement, Montgomery was required (i) to beware of, and guard against, the intrusion of competing claims, including specifically the Mississippi claims, (ii) to object to the Mississippi claims, (iii) to protect, advance and maximize Plaintiffs' claims and recovery, and (iv) to object to the inadequate proposed settlement agreement. Montgomery materially breached the Contingent Fee Agreement by failing to discharge these obligations.

100.    Montgomery materially breached the Contingent Fee Agreement by failing to represent the interests of the Plaintiffs zealously, competently and diligently in the bankruptcy proceedings, failing to maximize the recovery obtained by Plaintiffs in the bankruptcy proceedings,

failing to protect the claims of the Plaintiffs as against other purported creditors of the bankruptcy estate, failing to object to competing claims and claimants whose effect was to diminish the recovery to Plaintiffs, failing to advise Plaintiffs regarding procedural options (including a possible return to state court), and failing to avoid conflicts of interest.

101.    In breach of its contractual obligations, Montgomery failed to conduct sufficient due diligence with respect to the alleged Mississippi claims.

102.    In breach of its contractual obligations, Montgomery failed to protect the interests of the Avoca Plaintiffs, and failed to maximize their recovery, by failing to object to the "omnibus" proof of claim ostensibly filed on behalf of the Mississippi claimants on multiple grounds, including, *inter alia,* (i) that it failed to conform to the claim requirements; (ii) that it purported to assert multiple claims on behalf of multiple claimants in a single proof of claim; (iii) that it purported to assert a claim on behalf of an "ad hoc" entity that did not exist and/or, in any event, was not a creditor of the debtor; (iv) that it failed to document and substantiate the alleged claims; and (v) that it asserted purported claims that were inappropriate subject matter for the Category D fund.

103.    In breach of its contractual obligations, Montgomery failed to exercise available procedural options to adjudicate and maximize the Avoca Plaintiffs' claims (including a possible return to state court) and instead, artificially, and without reason, assigned inadequate values to the disease categories comprising the Avoca Plaintiffs' claims, resulting in diminished claims that failed to compensate the Plaintiffs fully.

104.    In breach of their contractual obligations, Defendants failed to avoid conflicts of interest, and instead created such conflicts by representing Mr. Carroll as a member of the Creditors' Committee, and in that capacity undertaking to draft the trust documents, while already contractually obligated to protect the unique interests of the Avoca Plaintiffs.

105.    In breach of its contractual obligations, Montgomery failed to draft the trust documents in a manner to protect Plaintiffs' interests in the Category D fund, and specifically failed to draft those documents to protect Plaintiffs' interests from dilution resulting from the inclusion and eventual allowance of the Mississippi claims.

106.    In breach of its contractual obligations, Montgomery improperly, prematurely and without cause abandoned the interests of the Avoca Plaintiffs in the bankruptcy proceedings while their claims remain unresolved.

107.    In breach of its contractual obligations, Montgomery failed to object to the proposed settlement agreement, which underfunded payment of Category D claims.

108.    In breach of its contractual obligations, Montgomery failed to provide the Avoca Plaintiffs with critical information necessary for the continued prosecution of their claims in the bankruptcy proceedings.

109.    As a result of Montgomery's material breaches of contract, Plaintiffs sustained damages, including but not limited to the loss of more than $140 million in recoveries allocated to Category D claimants, and the loss of further sums that would have been allocated to Plaintiffs' claims had Montgomery valued them properly.

110.    As express and/or implied intended third-party beneficiaries, Plaintiffs have standing to bring this action for breach of contract and to recover damages herein.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in favor of the Plaintiff class and against Defendant Montgomery, McCracken, Walker and Rhoads LLP, and to award damages in the amount of $619,306,880, plus statutory interest and costs.

**_Plaintiffs demand trial by jury._**

Respectfully submitted,

Scott M. Hare, Esquire
Pa. I.D. No. 63818

Scott@ScottLawPGH.com

1806 Frick Building
437 Grant Street
Pittsburgh, PA 15219

Tel:     412-338-8632

Counsel for Plaintiffs

Date:   April 11, 2018

Exhibit A

Contingent Fee Agreement dated January 27, 2009

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

# Contingent Fee Agreement

The Powell Law Group, P.C. ("PLG") hereby retains Montgomery, McCracken, Walker & Rhoads, LLP ("MMW&R") on a contingent fee basis in connection with the PLG's current representation of approximately 4,362 plaintiffs in the case captioned as In Re: Avoca Litigation now pending in the Court of Common Pleas of Luzerne County, Pennsylvania, Civil Action No. 7-2005 (the "Avoca Litigation"). MMWR will, in a manner to be mutually agreed with PLG, represent the interests of these same plaintiffs in the bankruptcy proceeding of Tronox, Incorporated, and all related entities, now pending in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-10156-ALG ("Tronox Bankruptcy"). MMWR shall proceed in the Tronox Bankruptcy in such manner as PLG and MMWR shall both agree. MMWR shall also assist PLG in the Avoca Litigation in such manner as PLG and MMWR shall both agree.

Attached hereto as Exhibit A is a copy of the form of Contingent Fee Agreement that is now in effect in identical or similar form between PLG and each of its said clients in the Avoca Litigation.

From PLG's own contingent fee paid to it by its own said clients, and from no other source, PLG hereby agrees to pay MMWR compensation for its professional services as follows:

(a)     MMW&R, for and in consideration of its professional services in the Tronox Bankruptcy and Avoca Litigation shall retain and be paid as its contingent fee the greater of (1)1% of the cumulative gross recovery of all of PLG's said clients (whether obtained through the Tronox Bankruptcy or otherwise); or (2) 1.5 times MMWR's standard hourly rates with respect to the gross recovery during the first six months after execution of this Contingent Fee Agreement; 1.8 times MMWR's standard hourly rates with respect to the gross recovery during the next six months after execution of this Contingent Fee Agreement standard hourly rates; and 2.1 times MMWR's standard hourly rates with respect to the gross recovery during the period more than twelve months after execution of this Contingent Fee Agreement. The amount of monies actually recovered after the date of execution of this Contingent Fee Agreement, whether by settlement, verdict, or otherwise, and before the deduction of any costs, is referred to herein as the "gross recovery."

2387877vl

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

     (b)    MMWR will prepare monthly statements for PLG that reflect all work performed at MMWR's standard hourly rates then in effect, and such statements will be deemed approved unless questioned by PLG within 30 days of delivery of the statement.

     (c)    Should no money be recovered, MMW&R shall have no claim against PLG except for payment of expert witness costs as provided for below.

     (d)    The amount on which 1% of the gross recovery will be based shall include the present value (i.e., the current worth of the value of future payments) of any settlements involving future payments.

From any sum recovered by PLG's said clients, MMW&R shall also then be reimbursed for all of its costs other than attorney's fees, including but not limited to transcript costs, costs for service of process, filing fees, costs associated with downloading court filings and then preserving copies thereof, photocopying, postage, computerized research, and travel. PLG agrees to pay for itself, or to reimburse MMWR for if paid for initially by MMWR, the cost of any experts retained in the Tronox Bankruptcy or otherwise.

This Agreement shall be binding upon the heirs executors, successors, and assigns of PLG and MMW&R.

MMW&R shall have no obligation to represent PLG's said clients in any appeal.

It is understood and agreed that MMW&R does not guarantee in any way the likelihood of success for any recovery or any particular outcome. The provision for payment to MMWR as described above shall not be considered an indication that some particular amount, or any amount, will be recovered.

PLG shall communicate with its own clients in the Avoca Litigation in a manner acceptable to MMWR so as to conform with the requirements of Pennsylvania Rule of Professional Conduct 1.5(e).

2387877v1

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

PLG hereby acknowledges receipt of a duplicate copy of this Contingent Fee Agreement.

The Powell Law Group, P.C.

Date: 1/27/09

By: _____
Robert J. Powell, Principal

Date: _____

By: _____
Jill A. Moran, Principal

The foregoing terms and conditions are accepted by
Montgomery, McCracken, Walker & Rhoads, LLP

Date: JANUARY 22, 2009

By: _____
Leonard A. Busby, Partner

2387877v1

Exhibit B

Bar Date Order dated May 28, 2009

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, et al.,[1] | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER (A) SETTING BAR DATES FOR FILING PROOFS OF CLAIM, (B) APPROVING THE FORM AND MANNER FOR FILING PROOFS OF CLAIM AND (C) APPROVING NOTICE THEREOF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (a) establishing the deadline for filing claims in these chapter 11 cases (the "Chapter 11 Cases"), (b) approving the form and manner for filing such claims and (c) approving notice thereof; and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors and other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

    1.      The Motion is granted.

---

[1]    The Debtors in these cases include:  Tronox Luxembourg S.ar.L; Tronox Incorporated; Cimarron Corporation; Southwestern Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide LLC.

[2]    Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Motion.

2.     Pursuant to Bankruptcy Rule 3003(c)(3), except as provided in paragraph 7 hereof, all persons and entities (including individuals, partnerships, corporations, joint ventures, trusts, and governmental units), holding or wishing to assert a claim, as that term is defined in section 101(5) of the Bankruptcy Code (each, a "Claim"), against any of the Debtors that arose on or prior to the filing of the Debtors' Chapter 11 Cases on January 12, 2009, are required to file proof of such Claim (a "Proof of Claim") pursuant to the procedures and on or before the deadlines (each a "Bar Date" and, collectively, the "Bar Dates") established by this Order.

3.     Except as expressly provided herein, each and every Proof of Claim for a Claim that arose before the Petition Date against any of the Debtors, including a Claim pursuant to section 503(b)(9) of the Bankruptcy Code, in these Chapter 11 Cases shall be actually received on or before **August 12, 2009 at ~~8:00~~ 5:00 p.m. ~~(Eastern Time)~~ (Pacific Time)** (the "Bar Date").

4.     Pursuant to Bankruptcy Rule 3003(c)(2), all creditors that fail to comply with this Order by timely filing a Proof of Claim in appropriate form shall not be treated as a creditor with respect to such Claim for purposes of voting on a chapter 11 plan and distribution thereunder on account of such Claim.

5.     The standard form of Proof of Claim (the "Proof of Claim Form") attached to the Motion as Exhibit B is hereby approved.

6.     The following rules shall govern the completion and filing of each Proof of Claim:

    a.     Each Proof of Claim must conform substantially with the Proof of Claim Form or Official Form No. 10;

    b.     All Proofs of Claim must be **actually received** no later than **~~8:00~~ 5:00 p.m. ~~(Eastern Time)~~ (Pacific Time) on August 12, 2009** at the following address:

2

> **Tronox Claims Processing Center**
> **c/o Kurtzman Carson Consultants LLC**
> **2335 Alaska Ave.**
> **El Segundo, CA 90245**

Proof of Claim must be delivered to the above address by first class U.S. mail (postage prepaid), in person, by courier service, or by overnight delivery;

**The Debtors' notice and claims agents, Kurtzman Carson Consulting LLC ("KCC"), will not accept a Proof of Claim sent by facsimile or e-mail;**

c.    Each Proof of Claim will be deemed filed only when received;

d.    Each Proof of Claim must: (i) be signed by the creditor or if the creditor is not an individual, by an authorized agent of the creditor; (ii) be written in English; (iii) include a Claim amount denominated in United States dollars; (iv) state a Claim against only one Debtor; and (v) clearly indicate the Debtor against which the creditor is asserting a Claim;

e.    Each Proof of Claim must include supporting documentation (or, if such documentation is voluminous, a summary of such documentation) or an explanation as to why such documentation is not available; provided, however, that a Proof of Claim may be filed without supporting documentation upon the prior written consent of the Debtors and any other party in interest; provided, further, that any creditor that received such written consent shall be required to transmit such writings to the Debtors or other party in interest upon request no later than ten (10) days from the date of such request; and

f.    A creditor who wishes to receive acknowledgment of receipt of its Proof of Claim Form may submit a copy of the Proof of Claim Form and a self-addressed, stamped envelope to KCC along with the original Proof of Claim Form.

7.    Parties are <u>not</u> required to submit Proofs of Claim or interest in accordance with the procedures established herein for the following ~~categories of Claims~~:

a.    Any Claim for which a Proof of Claim has already been filed against the Debtors with the Clerk of the Court (the

3

"Clerk") in a form substantially similar to Official Bankruptcy Form No. 10;

b.    Any Claim that is listed on the Debtors' Schedules; provided, however, that: (i) the Claim is not scheduled as "disputed," "contingent" or "unliquidated"; (ii) the Claimant does not disagree with the amount, nature and priority of the claim as set forth in the Schedules; and (iii) the Claimant does not dispute that the Claim is an obligation of the specific Debtor(s) as set forth in the Schedules;

c.    Any Claim that has been allowed previously pursuant to an order of this Court;

d.    Any Claim against a Debtor that has been paid in full by any of the Debtors or any other party;

e.    Any Claim that is subject to specific deadlines, aside from those established pursuant to this Order, fixed by this Court;

f.    Any Claim held by a Debtor in these Chapter 11 Cases;

g.    Any Claim held by a current employee of the Debtors for Wages and Benefits (as defined in the order of this Court entered on February 6, 2009 [Dkt. No. 143] authorizing the Debtors to honor Claims for Employee Wages and Benefits);

h.    Any Claim that is limited exclusively to the repayment of principal, interest and/or other applicable fees and charges ("Debt Claim") owed under any bond or note issued by the Debtors pursuant to an indenture (a "Debt Instrument"); provided, however, that: (i) an indenture trustee under a Debt Instrument (the "Indenture Trustee") must file one Proof of Claim, on or before the Bar Date, with respect to all of the amounts owed under each of the Debt Instruments and (ii) any holder of a Debt Claim wishing to assert a Claim, other than a Debt Claim, arising out of or relating to a Debt Instrument must file a Proof of Claim on or before the Bar Date, unless another exception in this paragraph applies;

i.    Any Claim or interest that is based on an interest in an equity security of the Debtors; provided, however, that any ~~Claimant~~ person who wishes to assert a Claim against any of the Debtors based on, without limitation, Claims for

4

damages or rescission based on the purchase or sale of an equity security, must file a Proof of Claim on or before the Bar Date;[3] and

> j.    Any Claim allowable under sections 503(b) and 507(a)(1) of the Bankruptcy Code as an administrative expense of the Debtors' Chapter 11 Cases, with the exception of any Claim allowable under section 503(b)(9) of the Bankruptcy Code, which is subject to Bar Date as provided above.

8.    In the event the Debtors amend or supplement their schedules of liabilities (collectively, the "Schedules"), the Debtors shall give notice of any amendment or supplement to the holders of any Claim affected thereby, and such holders shall be afforded thirty (30) days from the date on which such notice is given or until the Bar Date, if the Bar Date is later, to file a Proof of Claim with respect to their Claim or be forever barred from doing so.

9.    The holder of any Claim that arises from the Debtors' rejection of any executory contract or unexpired lease after the date of entry of this Order shall file a Proof of Claim based on such rejection by the later of (a) the Bar Date, (b) a date provided in an order authorizing the Debtors to reject (or notice of rejection of) an executory contract or unexpired lease or (c) if no date is provided, thirty (30) days after the date of any order authorizing such rejection or notice of such rejection is entered.

10.    The Debtors, with the assistance of KCC, are hereby authorized and directed to serve the following materials by first class U.S. mail, postage prepaid, on all known creditor holding actual or potential Claims no later than five (5) business days after the date of entry of this Order: (a) written notice of the Bar Date in substantially the form annexed to the Motion as

---

[3]    The Debtors reserve all rights with respect to any such Claims including, *inter alia*, to assert that such Claims are subject to subordination pursuant to section 510(b) of the Bankruptcy Code

Exhibit C, (the "Bar Date Notice"); and (b) the Proof of Claim Form (collectively, the "Bar Date

Package").

      11.    The Bar Date Notice, substantially in the form attached to the Motion as

Exhibit C, is hereby approved.

      12.    KCC is further authorized and directed to mail the Bar Date Package no later than

five (5) business days after the date of entry of this Order to the following parties:

    a.    The U.S. Trustee;

    b.    Counsel to the agent for the Debtors' prepetition and postpetition secured lenders;

    c.    Counsel to the Creditors' Committee;

    d.    Counsel to the Equity Committee;

    e.    Anadarko Petroleum Corporation;

    f.    The ~~United States Attorney for the Southern District of New York~~ Attorney General of the United States or such other officer, as appropriate, on behalf of the United States Department of Justice, the Environmental Protection Agency, and the Securities and Exchange Commission;

    g.    All persons or entities that have requested notice of the proceedings in the Chapter 11 Cases;

    h.    All persons or entities that have filed Claims against the Debtors as of the date of entry of this Order;

    i.    All creditors and other known holders of Claims against the Debtors as of the date of entry of this Order, including all persons or entities listed in the Schedules as holding Claims against one or more of the Debtors;

    j.    All parties to executory contracts and unexpired leases of the Debtors listed on the Schedules;

    k.    All parties to litigation with the Debtors or, where individual addresses are not available, through their counsel of record;

    l.    The Attorney General of the United States or the United States Attorney for the Southern District of New York **or such other officer,** as appropriate, on behalf of the Environmental Protection Agency, and other agencies and instrumentalities of the Unites States of America;

     m.     State attorneys general for the states in which the Debtors' property is located;

     n.     The Internal Revenue Service;

     o.     The Debtors' current employees, and the Debtors' former employees to the extent that contact information for former employees is available in the Debtors' records; and

     p.     Such additional persons and entities as deemed appropriate by the Debtors.

13.     The Debtors are further directed, with the assistance of KCC, to include the following information on every Proof of Claim Form that they supply to a creditor whose Claim is listed on the Debtors' Schedules: (a) the amount of such creditor's Claim against the applicable Debtor (if such information is reasonably ascertainable), as reflected in the Schedules; (b) the type of Claim held by such creditor (i.e., non-priority unsecured, priority unsecured or secured), as reflected in the Schedules; and (c) whether such Claim is contingent, unliquidated or disputed as reflected in the Schedules. Any person or entity that receives the Proof of Claim Form is authorized to correct any incorrect information contained in the name and address portion of such form.

14.     The Debtors are hereby authorized to provide supplemental mailings of the Bar Date Package as may be necessary in situations, including, without limitation, (a) notices that are returned by the post office with forwarding addresses, (b) certain parties acting on behalf of parties in interest (e.g., banks and brokers with respect to bondholders and equity holders) that decline to pass along notices to these parties and instead return their names and addresses to the Debtors for direct mailing and (c) additional potential creditors that become known as the result of the Bar Date noticing process. Such mailings made at any time up to 30 days in advance of the Bar Date are hereby deemed timely. Notwithstanding the foregoing, the Debtors shall not be required to provide any additional notice to any creditor to whom the Debtors mailed the Bar

Date Package in accordance with the terms of this Order and such notice was returned to the Debtors as undeliverable without a forwarding address.

15.     Pursuant to Bankruptcy Rule 2002(f), the Debtors shall give notice of the Bar Dates by publishing the Bar Date Notice, modified for publication in substantially the form annexed to the Motion as Exhibit D (the "General Publication Notice"), in *The Wall Street Journal* on one occasion on or before July ~~12~~ 10, 2009.  The General Publication Notice shall include a telephone number that creditors may call to obtain copies of the Proof of Claim Form, a URL for a website where the creditors may obtain a copy of a Proof of Claim Form, and information concerning the procedures for filing Proofs of Claim.  The Debtors are authorized to enter into such transactions to cause such publication to be made and to make reasonable payments required for publication.

16.     The Debtors shall also give notice of the Bar Dates by publishing certain Site-Specific Publication Notices, modified for publication in substantially the form attached to the Motion as Exhibit E, in the publications listed in Exhibit F to the Motion, on one occasion on or before July ~~12~~ 10, 2009.  The Debtors are authorized to enter into such transactions to cause such publication to be made and to make reasonable payments required for publication.

17.     The forms of the General Publication Notice and the Site-Specific Publication Notices substantially in the form attached to the Motion as Exhibits D and E are hereby approved.

18.     The Debtors, with the assistance of KCC, are authorized to mail the Bar Date Notice to counsels of record for Tort Claimants for whom the Debtors lack personal information.

19.     The Debtors are authorized ~~to establish~~ without further notice to file with the Court one or more orders establishing additional Bar Dates, as necessary, (the "Supplemental

8

Bar Dates") with respect to (a) creditors as to whom a remailing of the Bar Date Package is appropriate, but which cannot be accomplished in time to provide at least thirty (30) days' notice of the Bar Date and (b) other creditors that become known to the Debtors after the applicable Bar Date; provided, however, that the Debtors obtain the written consent of the Creditors' Committee before establishing a Supplemental Bar Date;. provided, further, that the Debtors advise the Court of a Supplemental Bar Date by filing notice of such Supplemental Bar Date which identifies the Supplemental Bar Date and the creditors subject thereto. In the event the Debtors establish a Supplemental Bar Date, the Debtors shall mail a Bar Date Package, modified to include the Supplemental Bar Date, to Claimants who are subject to the Supplemental Bar Date within thirty (30) days of any Supplemental Bar Date.

20.    Notice of the Bar Dates as set forth in this Order and in the manner set forth herein (including the Bar Date Notice, the Bar Date Package, the General Publication Notice, the Site-Specific Publication Notices, and any supplemental notices that the Debtors may send from time to time) constitutes adequate and sufficient notice of each of the Bar Dates (including with respect to any environmental or tort Claims arising from or relating to the Legacy Businesses), and satisfies the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and General Order M-279.

21.    The Debtors are authorized, in their discretion and upon the written consent of the Creditors' Committee, to extend a Bar Date by stipulation where the Debtors determine that such extension is in the best interests of the Debtors and their estates.

22.    The Debtors are authorized to use the services of KCC to coordinate the processing of Proofs of Claim.

23.    Nothing in this Order shall prejudice the right of the Debtors or any other party in interest to dispute or assert offsets or defenses to any Claim reflected in the Schedules.

24.    Entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing a date by which holders of Claims or interests not subject to the Bar Dates contained herein must file such Proofs of Claim or interests or be barred from doing so.

25.    The Debtors and KCC are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order in accordance with the Motion.

26.    The terms and conditions of this Order shall be immediately effective and enforceable upon entry of the Order.

27.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  May 28, 2009
        New York, New York              /s/ Allan L. Gropper
                                        UNITED STATES BANKRUPTCY JUDGE

## VERIFICATION

I, **Stanley Waleski**, verify that the statements made in the foregoing Class Action Complaint and Jury Demand are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties set forth in 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

DATE: 3/29/18

_____
**Stanley Waleski**